IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 38560-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RYAN MASON BURGE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — The jury found Ryan Burge guilty of second-degree murder for the tragic death of five-year-old Heather, who suffered injuries while Burge cared for her. On appeal, Burge challenges the sufficiency of evidence to convict him of second-degree murder. He also challenges the trial court's imposition of an exceptional sentence. We affirm.

FACTS

The State alleged and the jury found that Ryan Burge killed five-year-old Heather, a pseudonym, on November 2, 2018. On that date, Burge engaged in a romantic

association with the mother of Heather, Nataasha Tafoya. Tafoya bore and cared for two other children: sixteen-year-old Thomas and fourteen-year-old Ken, both pseudonyms.

Ryan Burge and Nataasha Tafoya were high school classmates. Eighteen years after high school and in August 2018, the two reconnected and entered a relationship. Burge then lived with his sister in Longview. Beginning in September 2018, Burge stayed at Tafoya's Vancouver apartment a few nights per week. Sometimes, while Tafoya worked, she left Heather in Burge's care. Tafoya trusted and relied on Burge to watch her young daughter.

On the morning of November 2, 2018, before Nataasha Tafoya left for work, she noticed no bruises, abrasions, scrapes, or other injuries on Heather. Ryan Burge drove Tafoya to work around 7:30 a.m. Burge returned to Tafoya's apartment and, after Thomas and Ken left for school, Burge cared for Heather alone.

At 3:01 p.m. on November 2, Ryan Burge and Heather shopped at a Safeway grocery store a half a mile from Nataasha Tafoya's apartment. Safeway video surveillance showed the two leaving the store at 3:28 p.m. The footage revealed no visible injuries on Heather.

At 3:30 p.m., Thomas began a wrestling match in his high school's gymnasium. Ken waited in the gymnasium for the match to end.

At 4:04 p.m., Ryan Burge sent Nataasha Tafoya a text message that requested her to return home because Heather had "lost it." Report of Proceedings (RP) at 895. Tafoya

2

assumed that Burge referenced Heather throwing a temper tantrum, which tantrums, according to Tafoya, Burge had always managed before. Tafoya replied by text that her sons would arrive home and assist Burge soon.

Within minutes of texting Nataasha Tafoya, Ryan Burge called his girlfriend and disclosed that he needed to call 911 due to Heather's uncontrollable behavior. Tafoya told Burge to calm down and that calling 911 over a temper tantrum would be extreme. Burge placed Tafoya on speakerphone to allow her to calm Heather by speaking on the phone. During the call, Tafoya never heard Heather crying, yelling, or talking. She only heard Heather breathing.

During the phone call, Ryan Burge told Nataasha Tafoya that Heather had hit her head. Burge sent Tafoya a photograph of Heather via text message. From the photo, Tafoya could see Heather with a bloody lip. Tafoya noticed no other injuries to Heather. Nevertheless, Tafoya left work to comfort Heather.

AT&T telephone records reveal that Ryan Burge called 911 at 4:11 p.m., but terminated the call before an operator answered. Also at 4:11 p.m., 911 returned Burge's cellphone call. Burge did not answer.

During Thomas' wrestling meet, Ryan Burge called Thomas' cellphone, which phone Ken held. Ken answered and handed the cellphone to Thomas. Burge told Thomas that he and Ken needed to return home immediately because of Heather's

3

condition.  Thomas could not hear Heather in the background.  Around 4:30 p.m., Thomas and Ken left for home, a six-minute walk from the school.

When Thomas and Ken arrived home, they observed Heather lying motionless on her bed in the three siblings' shared bedroom.  Thomas noticed a lump on Heather's head and blood on her nose and mouth.  Heather did not speak to her brothers.  Ryan Burge did not describe any events leading to Heather's condition and instead instructed them to stay with her while he retrieved their mother from work.  Burge told Thomas and Ken to review Heather's breathing and to call 911 if her condition worsened.

Nataasha Tafoya returned home to find Heather breathing heavily and unresponsive.  Heather did not move her arms or legs.  Tafoya called 911.

Vancouver paramedics arrived at Nataasha Tafoya's apartment.  While tending to Heather, the medics inquired about what occurred.  Tafoya said that she and Ryan Burge had sent Heather to her room due to her temper tantrum.  At trial, however, Tafoya testified that she lied about earlier being at the apartment, because Burge had fretted that law enforcement would blame him for Heather's injuries.

Vancouver paramedics found Heather unconscious.  Justin Huskisson, one of the medics, noted multiple injuries to the front and back of Heather's head and bruises to the girl's face and extremities.  All of Heather's teeth were missing.  Huskisson could not fathom how a five-year-old could sustain such injuries to both sides of her head.

Heather's condition loomed more serious than expected based on Ryan Burge's story that Heather ran into the wall and flung herself against the bunk bed.

Paramedic Justin Huskisson rotated Heather onto her back. Huskisson noticed blood and vomit in her airway, which contents paramedics suctioned. Paramedics transported Heather, while attempting interventional treatment. Heather remained unconscious.

Vancouver Police Department Officer Jesse Stokes approached Nataasha Tafoya and Ryan Burge outside Tafoya's apartment. Burge explained that Heather threw a tantrum after the two left the Safeway. Burge had denied her candy. Once home, Heather threw herself into a wall and knocked herself unconscious. Officer Stokes and Burge entered the apartment so that Burge could mimic Heather's actions. Burge explained that he ushered Heather into her bedroom without force and then placed her in her elevated bed. Burge left Heather in the bedroom, and she began kicking the wall.

Ryan Burge described to Officer Jesse Stokes that, when he reentered Heather's room, she braced herself to the railing of her bed, which railing stood one foot high. Heather proceeded to throw herself into the wall by her bed. Burge identified holes in the wall by the bed, which he claimed Heather's frenzy caused. Burge admitted that he did not call 911.

While perusing Nataasha Tafoya's apartment, law enforcement examined three impact marks in the wall next to Heather's bed. Police found Heather's hair in two of the

5

three wall indentations.  Officers determined that the third impact mark resulted from a past, unrelated incident.  Police found blood on Heather's pillow and mattress.

Vancouver paramedics transported Heather to a hospital emergency department.  Dr. Jon Eggen, M.D. observed forehead bruising and abrasions, contusions around her mouth, and a large bruise on her head.  Heather's pupils did not react or dilate.  Dr. Eggen concluded that Heather suffered a traumatic brain injury.  The Vancouver hospital airlifted Heather to Portland's Randall Children's Hospital to be seen by a pediatric neurosurgeon.

Heather arrived at the children's hospital in a coma.  Neurosurgeon David Adler found no brainstem function.  A CT scan revealed Heather's brain suffered a lack of oxygen, lack of blood flow, and a subdural hemorrhage.  Heather had suffered a stroke.  Dr. Adler operated on Heather.  Heather died during surgery at 8:15 p.m. on November 2, 2018.

At trial, Dr. David Adler testified that Heather's brain injury was new.  He opined that earlier medical intervention likely would not have improved her odds of survival from the traumatic brain injury.

Nataasha Tafoya's apartment was equipped with two security cameras, one inside and one outside of the residence.  Ryan Burge and Nataasha Tafoya had access to the cameras' footage through a cell phone application.  No one else had access to the surveillance footage.  The cameras and the phone application were created by Arlo

Technologies (Arlo). Burge's mother, Pam Burge, met with her son and Tafoya in the lobby of the police station on the day of Heather's death. She then noticed her son viewing, on his cellphone, video footage from inside of Tafoya's apartment.

On the evening of November 2, 2018, law enforcement interviewed Ryan Burge at the Vancouver Police Department. Burge repeated his story that Heather threw a temper tantrum after he refused to buy her candy at Safeway. After sending Heather to her room, Burge heard her kicking the walls. When he entered her room, Heather hit her head against the wall by her bed. Heather used her feet to propel herself from the bed railing and thereby struck her head such that she dented the wall multiple times. Burge told officers he attempted to pull Heather from the wall by her legs, but she wrested free from him and continued to hit her head on the wall. Law enforcement asked Burge to list the injuries to Heather that he saw. He responded that she had "'goose eggs'" on her head and a mark on the side of her forehead. Clerk's Papers (CP) at 9. Burge denied causing Heather any harm.

On November 5, 2018, Martha Burt, M.D. performed an autopsy on Heather. Dr. Burt determined that Heather weighed forty to fifty pounds and measured 3 feet 4 inches in height. Dr. Burt noted Heather had multiple bruises and abrasions to her head. Burt concluded that Heather's body suffered impact points from different planes, which injuries rendered Ryan Burge's explanation inconsistent. Heather's back underwent two large contusions linear in shape. Dr. Burt found lacerations on the inside of Heather's

7

lips and petechiae inside her eyelids and on her ears. Petechiae are pinpoint-sized spots of bleeding under the skin or mucous membranes.

Dr. Martha Burt opined that Heather's injuries were consistent with being struck multiple times and that her cause of death was blunt force trauma to the head. The injuries to her back were consistent with being repeatedly punched or kicked or struck with a small, irregular object. Dr. Burt believed that Heather's subarachnoid hemorrhage was fatal and that this injury would have resulted in death within several hours. She estimated that Heather's head and face sustained at least thirty blows and the remainder of her body suffered at least twenty-five impacts. At trial, Dr. Burt testified that each of Heather's injuries, if viewed in isolation, could have been accidental. But, taken together, the injuries could not be nonaccidental or self-inflicted.

At trial, forensic scientist David Stritzke of the Washington State Patrol crime laboratory testified that Ryan Burge's DNA was found in Heather's fingernail scrapings. Officer Keola Wilhelm averred that Burge had a scratch on his right hand on the day Heather died. On November 2, 2018, Burge weighed approximately 200 pounds and measured 5 feet 7 inches in height.

On November 7, 2018, Vancouver Police Officer Jason Mills requested Arlo Technologies to preserve the video footage of Nataasha Tafoya's apartment from November 2, 2018. Pursuant to the terms of Tafoya's subscription, all footage captured by her security cameras would be automatically deleted after seven days, with the footage

being unrecoverable thereafter. Footage would also become nonrecoverable if a user or subscriber with access to Tafoya's account deleted the footage.

Officer Jason Mills learned that no surveillance footage existed encompassing the time period between 3:00 p.m. to 5:00 p.m. on November 2, 2018. Arlo Technologies never responded to the preservation request. Law enforcement did not seek a search warrant for Arlo's records, because of the likelihood of missing footage. At trial, Officer Mills testified that law enforcement presumed that someone with access to Nataasha Tafoya's Arlo account deleted video footage from the time period when Heather suffered injury.

PROCEDURE

The State of Washington charged Ryan Burge with one count of murder in the first degree and one count of felony murder in the second degree based on the predicate offense of assault in the second degree. The State alleged three aggravating circumstances for each charge: (1) Burge's conduct manifested deliberate cruelty to Heather, (2) Heather was particularly vulnerable or incapable of resistance, and (3) Burge used his position of trust to facilitate the offense. The State sought an exceptional elevated sentence based on the aggravating circumstances.

Several medical experts testified at trial. Dr. Jon Eggen, Heather's treating emergency room physician, testified that, out of the thousands of intracranial injuries he had treated, most of them resulted from ground-level falls or motor vehicle accidents. He

9

opined that Heather's injuries contradicted any temper tantrum. Emergency department nurse Andre Didyk testified that Heather's level of unconsciousness was consistent with high-speed motor vehicle accidents or falls from a height, such as from a second-story window.

Heather's treating neurosurgeon, Dr. David Adler, averred that he did not believe any child could inflict injuries of such severity as those, according to Ryan Burge, Heather sustained from hitting her head against a wall, especially because Heather suffered injuries to the front and back of her head. Dr. Adler explained that a significant amount of force would be required to cause Heather's subdural hemorrhage and stroke. Adler described Heather's injuries as non-survivable. The injuries could not result from accidental trauma. A severe blow or a severe acceleration and deceleration had to have occurred.

Child abuse pediatrician Kimberly Copeland testified that she knew of no instance when a five-year-old child caused injuries leading to her death by striking his or her head against a wall or object. Due to the severity of Heather's injuries, the injuries lying in multiple locations, and the injuries found along multiple planes on her body, Dr. Copeland opined that the injuries could not have been caused by an impact to a wall. Dr. Copeland believed that drywall lacks the hardness capable of causing blunt impact severe enough to have resulted in Heather's injuries. Heather's injuries harmonized with non-accidental trauma.

10

Dr. Kimberly Copeland reviewed Heather's medical history prior to testifying. During her trial testimony, Dr. Copeland noted that, beginning with Heather reaching twelve months of age, Nataasha Tafoya raised concerns of Heather banging her head on objects to her daughter's pediatrician approximately four times. Copeland highlighted that, on each occasion when Tafoya expressed concern about Heather's head banging, Heather suffered from an illness, at least two of which were ear infections. The expert pediatrician concluded that Heather banged her head to cope with her illnesses. Dr. Copeland reassured Tafoya that Heather's head banging was expected behavior for her age and her temporary illnesses.

Heather's medical records chronicled no earlier injuries resulting from head banging. No head banging or tantrum resulted in Heather losing consciousness, sustaining a concussion, or being admitted to a hospital.

Heather's eldest brother, Thomas, described a time when Heather threw an iPad tablet into the air. When she threw it, she inadvertently hit her head on the couch. Thomas testified that Heather had also hit her head on the "corner or something" of some unidentified object on another occasion. He maintained, however, that Heather had never knocked her teeth out or lost consciousness as a result of any tantrum or head banging.

During trial, Heather's other brother, Ken, testified that Heather threw fits if she did not get what she wanted, such as TV time or candy. He averred that once Heather threw herself back and hit the floor, thereby causing a goose egg on her head. Ken

declared that Heather had never needed medical attention or lost consciousness as a result of a fit. Heather's tantrums never resulted in injuries approaching the injuries Heather sustained on November 2, 2018.

Nataasha Tafoya testified that Heather had three or four tantrums per week. She described two of Heather's tantrums as "exorcist-type." RP at 876. During these two tantrums, Heather arched her back, squealed, and thrashed her body. Tafoya admitted that no tantrum had earlier resulted in loss of consciousness, detached teeth, or the need for hospitalization.

The jury could not unanimously decide Ryan Burge's guilt as to murder in the first degree. The jury found Burge guilty of the lesser-included offense of manslaughter in the first degree. The jury also found Burge guilty of murder in the second degree. For each conviction, the jury found that the State proved all three aggravating circumstances: deliberate cruelty, particular vulnerability, and position of trust. The trial court vacated the jury's conviction for manslaughter in the first degree on double jeopardy grounds. The court entered judgment of guilt only on second-degree murder.

During the sentencing hearing, the State sought to prove Ryan Burge's criminal history. The State submitted a judgment and sentence from Cowlitz County for malicious mischief and sentencing paperwork regarding a 2009 federal conviction for conspiracy to commit arson.

Defense counsel objected to counting the federal conviction in Ryan Burge's

12

offender score because of a lack of comparability to any Washington offense. The State

conceded that federal arson was not legally comparable to Washington arson. The State

argued that the federal conviction factually compared to Washington's crime. The

State's attorney's commented:

> [I]n the statement of facts section, the defendant agreed to the following facts before the Court in Federal Court: He admitted that he acted in concert with others, set fire to a duplex residence, that this residence was set on fire in order to obtain insurance proceeds, that he did so maliciously, and that he acted in concert with other people. That there was an overt act committed by both him and the other persons in furtherance of the conspiracy. The statement of facts indicates the defendant admitted to setting the fire—or causing the gasoline vapors to ignite and explode himself.
> Looking at the elements of arson in the first degree under Washington law, 9A.48.020, a person is guilty of arson in the first degree if he knowingly and maliciously causes a fire or explosion which damages a dwelling, that is sub B, or, sub [D], causes a fire or explosion on property with intent to—valued at $10,000 or more with intent to collect insurance proceeds.
> The State contends that the defendant admitted facts in Federal Court that would qualify under either sub B or sub D. He admitted that he acted in concert with other persons. *That is factually comparable to arson in the first degree and a conspiracy to commit the same under Washington law, which would then count as two points toward the offender score.*

RP at 1930-31 (emphasis added).

The sentencing court adopted the State's calculation of Ryan Burge's offender

score of 3, two points of which it attributed to the federal conspiracy to commit arson

conviction. Burge's standard range for the sole conviction for second-degree murder was

154 to 254 months' confinement.

At the sentencing hearing, the trial court discussed the aggravating circumstances found by the jury. The court stated Heather's age and her reliance on adults rendered her particularly vulnerable. Heather's presence in her home, an expected safe environment, added to her vulnerability. The court commented that, while video footage showed little caretaking by Ryan Burge, Burge occupied a position of trust because Nataasha Tafoya left him with the responsibility of caring for Heather while Tafoya worked. The sentencing court noted that Heather may have thrown a tantrum, but all children throw tantrums. Caretakers cannot respond similarly.

After considering the three aggravating circumstances, the sentencing court imposed an exceptional aggravated sentence of 480 months' confinement. The court further imposed 36 months of community custody. The court found Ryan Burge to be indigent and unable to pay legal fines and obligations. The judgment and sentence, however, contains a community custody provision requiring that Burge pay Department of Corrections supervision fees.

The sentencing court entered findings of fact and conclusions of law for an exceptional sentence. The findings of fact read, in their totality:

> I. The exceptional sentence is justified by the following aggravating circumstances as found by the jury via special verdict:
> a. The defendant knew, or should have known, that the victim of the offense was particularly vulnerable or incapable of resistance, and this vulnerability was a substantial factor in the commission of the crime;
> b. The defendant used his position of trust or confidence to facilitate the commission of the crime;

14

c. The defendant's conduct during the commission of the crime manifested deliberate cruelty to the victim.
        II.  The ground[s] listed in the preceding paragraph, taken together or considered individually, constitute sufficient cause to impose the exceptional sentence.  This court would impose the same sentence if only one of the grounds listed in the preceding paragraph is valid.

CP at 164-65.  The two conclusions of law entered by the trial court declared:

I.  There are substantial and compelling reasons to impose an exceptional sentence pursuant to RCW 9.94A.535.
        II.  The court imposes an exceptional sentence above the standard range of 480 months on count 02, Murder in the Second Degree.

CP at 165.

## LAW AND ANALYSIS

### Second-Degree Murder

Ryan Burge argues that the State presented insufficient evidence to convict him of felony murder in the second degree.  In particular, Burge contends that the State failed to prove that he intentionally caused Heather's injuries or knew of and disregarded a substantial risk of bodily harm to her.  Burge requests that this court reverse and remand for the trial court to dismiss the second-degree murder conviction and reinstate the jury's conviction of manslaughter in the first degree.  The State responds that it presented evidence to demonstrate that Ryan Burge intentionally assaulted Heather or recklessly inflicted substantial bodily harm to her beyond a reasonable doubt.

When analyzing whether sufficient evidence supports a defendant's conviction, this court views the evidence in the light most favorable to the prosecution and

determines whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt. *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). In a challenge to the sufficiency of the evidence, circumstantial evidence and direct evidence carry equal weight. *State v. Dollarhyde*, 9 Wn. App. 2d 351, 355, 444 P.3d 619 (2019). The challenging party bears the burden of demonstrating that a finding is unsupported by substantial evidence. *State v. Vickers*, 148 Wn.2d 91, 116, 59 P.3d 58 (2002). We bestow deference to the trier of fact who resolves conflicting testimony and evaluates the credibility of witnesses and persuasiveness of material evidence. *State v. Carver*, 113 Wn.2d 591, 604, 781 P.2d 1308, 789 P.2d 306 (1989).

A defendant may be found guilty of murder in the second degree pursuant to RCW 9A.32.050(1), when:

> (b) He or she commits or attempts to commit any felony, including assault, other than those enumerated in RCW 9A.32.030(1)(c), and, in the course of and in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants.

The enumerated felonies under RCW 9A.32.030(1)(c) do not include assault in the second degree. Thus, second degree assault qualifies as a predicate crime for second degree murder.

16

Second degree felony murder based on second degree assault requires the State to prove that the defendant acted intentionally and disregarded a substantial risk that substantial bodily harm may occur. *State v. Gehrke*, 193 Wn.2d 1, 17, 434 P.3d 522 (2019) (plurality opinion); *State v. Gamble*, 154 Wn.2d 457, 467-68, 114 P.3d 646 (2005). The State must establish that the victim's death occurred as a result of the assault. *State v. Gamble*, 154 Wn.2d 457, 467 (2005).

Assault by battery is "an unlawful touching." *State v. Elmi*, 166 Wn.2d 209, 215, 207 P.3d 439 (2009). The offense requires intent to do the physical act constituting assault. *State v. Keend*, 140 Wn. App. 858, 867, 166 P.3d 1268 (2007).

Under RCW 9A.08.010(1)(c),

> A person is reckless or acts recklessly when he or she knows of and disregards a substantial risk that a wrongful act may occur and his or her disregard of such substantial risk is a gross deviation from conduct that a reasonable person would exercise in the same situation.

Whether an act is reckless depends on the defendant's knowledge and the conduct of a reasonable person when knowing those facts. *State v. R.H.S.*, 94 Wn. App. 844, 847, 974 P.2d 1253 (1999).

Ryan Burge argues that his conviction rested on pure speculation, because the State failed to identify or submit evidence of any act he committed that caused Heather's life-threatening injuries and death. According to Burge, the evidence at most demonstrated that Heather likely did not inflict her own injuries, not that he caused the

injuries, let alone intentionally caused the injuries. Although medical expert testimony implied that intentional acts caused Heather's injuries, this testimony failed to prove beyond a reasonable doubt that Burge intentionally assaulted her. The jury heard evidence that supported the conclusion that the child's injuries were caused by intentional, reckless, negligent, or accidental acts, but no evidence of who performed those acts.

Ryan Burge relies on *State v. Melland*, 9 Wn. App. 2d 786, 452 P.3d 562 (2019), in which the jury found Tristan Melland guilty of second-degree assault. The prosecution alleged that Melland fractured the victim's finger when he grabbed a phone and wrested the phone from her hand. The State argued that the severity of the finger injury demonstrated that Melland acted recklessly. This court disagreed, while reasoning that the seriousness of the injury supported finding Melland inflicted substantial harm on the victim, but not that he acted recklessly in inflicting the injury.

Ryan Burge contends that the State, as in *State v. Melland*, only proved the severity of Heather's injuries, not that he acted recklessly. Going further, according to Burge, the State, unlike in *Melland*, failed to establish that Burge performed any acts leading to the injuries.

We distinguish *State v. Melland*. A reasonable person does not know that grabbing a phone out of an individual's hand would result in a broken finger. The broken

18

finger was unexpected. The State's evidence established that Ryan Burge did more than accidentally harm Heather through a single act.

The State cites *State v. R.H.S.*, 94 Wn. App. 844 (1999), another prosecution for second degree assault. Defendant R.H.S. punched a fifteen-year-old boy in the face, thereby causing injury to his eye serious enough to require surgery. This court held that the evidence established that R.H.S. acted recklessly, because any reasonable person knows that punching someone in the face could result in a broken jaw, nose, or teeth, any of which constitutes substantial harm.

We distinguish *State v. R.H.S.* because the State fails to identify any actions taken by Ryan Burge. *R.H.S.* remains instructive, nevertheless. Medical expert testimony established that Heather suffered numerous, nonsurvivable injuries, and that she could not have inflicted the injuries with her own conduct. She suffered injuries consistent with punching, kicking, or throwing of her body. A comatose Heather exhibited bruises, abrasions, and fixed pupils due to a traumatic brain injury. The injuries came from different directions. Pathologist Martha Burt estimated that someone struck Heather a minimum of fifty times. The harm caused was such that a reasonable person that inflicted the damage would know that his or her conduct would inflict substantial bodily harm. Burge was the only one with access to Heather during the time she sustained her deadly injuries. The State did not need to prove whether Burge punched, kicked, struck,

19

threw, or a combination of actions caused the harm. The State presented strong circumstantial evidence of Burge's guilt.

Criminal intent may be inferred from circumstantial evidence when logic establishes such intent. *State v. Billups*, 62 Wn. App. 122, 126, 813 P.2d 149 (1991). Ryan Burge cites no authority requiring that the State provide direct evidence of how a victim's injuries occurred.

Evidence beyond the injuries suffered by Heather supported a guilty verdict against Ryan Burge for intention assault. All video footage from Nataasha Tafoya's video surveillance taken between 3:00 p.m. and 5:00 p.m. on November 2, 2018 went missing. Heather endured her injuries during this timeframe. Burge and Tafoya were the only individuals with access to the cellphone application, from which one could view or delete captured footage. Burge's mother saw Burge review footage from the interior camera while waiting in the Vancouver Police Department lobby. Heather's fingernail scrapings contained Burge's DNA.

Particular Vulnerability

Ryan Burge asserts four arguments, some related, in support of his challenge to his exceptional sentence. First, the State presented insufficient evidence to prove any of the three alleged aggravating circumstances: particular vulnerability, position of trust, and deliberate cruelty. Second, the trial court erred by imposing an exceptional aggravated sentence based on its improper judicial fact-finding as to the aggravating factors. Third,

the facts do not support the trial court's findings of fact and conclusions of law for an exceptional sentence. Fourth, each aggravator is unconstitutionally vague.

The State responds sufficient evidence supported all three aggravating circumstances beyond a reasonable doubt. The State argues that the trial court did not engage in additional fact-finding, but rather correctly determined that the aggravating circumstances found by the jury constituted substantial and compelling reasons for an exceptional aggravated sentence. It contends that Ryan Burge may not raise a vagueness challenge to the aggravating circumstances, as they are not subject to vagueness review.

This court applies the same standard of review when considering a claim of insufficient evidence of an aggravating factor as it would for a claim of insufficient evidence of a crime's element. *State v. Zigan*, 166 Wn. App. 597, 601, 270 P.3d 625 (2012). Aggravating circumstances must be proven beyond a reasonable doubt. RCW 9.94A.537(3). RCW 9.94A.535(3) lists the aggravating circumstances considered by a jury.

We first address particular vulnerability. For a victim's vulnerability to justify an exceptional sentence pursuant to RCW 9.94A.535(3)(b), "the State must show (1) that the defendant knew or should have known (2) of the victim's *particular* vulnerability and (3) that vulnerability must have been a substantial factor in the commission of the crime." *State v. Suleiman*, 158 Wn.2d 280, 291-92, 143 P.3d 795 (2006) (emphasis in original).

Whether a victim is particularly vulnerable is not a legal question, but a factual one that must be supported by the evidence. *State v. Suleiman*, 158 Wn.2d 280, 292 (2006).

Ryan Burge maintains that the State failed to submit adequate evidence that show Heather's particular vulnerability to the offense of second-degree murder or that her vulnerability was a substantial factor of the asserted crime. He agrees that the evidence showed that Heather was young and alone with him when she sustained her fatal injuries. But he contends the evidence did not show that Burge assaulted her due to her being vulnerable. He asserts that, under the State's view of particular vulnerability, the aggravator would apply in any killing of a young child.

Ryan Burge cites *State v. Serrano*, 95 Wn. App. 700, 977 P.2d 47 (1999), in which the trial court imposed an exceptional sentence on Jose Serrano for second-degree murder and second-degree unlawful possession of a firearm. The victim, Froilan Gutierrez, was in an orchard ape, a caged platform on a hydraulic lift, at the time Serrano shot him. On appeal, this court held that, although Gutierrez may have been particularly vulnerable, the record did not establish that this vulnerability was a substantial factor in the shooting.

Ryan Burge also analogizes *State v. Barnett*, 104 Wn. App. 191, 16 P.3d 74 (2001), *abrogated on other grounds by State v. Epefanio*, 156 Wn. App. 378, 392, 234 P.3d 253 (2010). This court reversed Benjamin Barnett's exceptional sentence based on multiple aggravating circumstances, including particular vulnerability. The trial court sentenced Barnett on several convictions, including unlawful imprisonment, second-

degree rape, first-degree kidnapping, second-degree assault, and assault in violation of a

protective order. This court concluded that, while Barnett's crimes were vicious, his

seventeen-year-old female victim was not particularly vulnerable. This court wrote:

> Ms. M led Mr. Barnett on a lengthy chase. She did not suffer because of age, disability, or ill health. Further, Ms. M was not incapacitated by the attack and thereby rendered vulnerable. She was able to avoid his attempts to stab her and eventually escaped.
> Ms. M was home alone. But that was not the reason he chose her as a victim. Mr. Barnett chose Ms. M because of their failed relationship, not because she presented an easy target for a random crime. The evidence does not support a finding of particular vulnerability.

*State v. Barnett*, 104 Wn. App. 191, 204-05 (2001) (internal citations omitted).

*State v. Serrano* and *State v. Barnett* do not possess relevance to Ryan Burge's

prosecution. Neither case stands for the proposition that: (1) a child is not particularly

vulnerable solely due to extreme youth or (2) the State must demonstrate that a victim's

vulnerability was the reason why the perpetrator selected them for victimization.

We agree with the State that the jury reasonably found Heather to be particularly

vulnerable and incapable of resistance due to her age of five years old and being home

alone with Burge. Burge knew or should have know of this vulnerability. He likely

would not have picked on someone his own size.

In *State v. Fisher*, 108 Wn.2d 419, 739 P.2d 683 (1987), Richard Fisher received

an exceptional sentence based on two counts of indecent liberties pursuant to four

aggravating circumstances, including particular vulnerability. The victim was five years

old.  On appeal, the Washington Supreme Court concluded that a jury could reasonably conclude that the victim's age rendered him incapable of resistance and thus particularly vulnerable.  Extreme youth alone could constitute particular vulnerability.

In *State v. T.E.H.*, 91 Wn. App. 908, 960 P.2d 441 (1998), the trial court found eleven-year-old juvenile T.E.H. guilty of molesting his five-year-old cousin.  The court imposed a manifest injustice disposition of 78 weeks based on particular vulnerability. This court held that the evidence supported the aggravating factor because T.E.H. was physically bigger than his cousin.  The cousin lacked the ability of protection from others because of the two being alone in the house.

A young child, under the supervision of her assailant, remains particularly vulnerable when compared to the typical victim of second-degree murder.  Ryan Burge could inflict injury on Heather because of his size compared to Heather's dimensions. Heather lacked any protections inside the home.

Ryan Burge contends that a victim may only be found particularly vulnerable if the accused committed the crime only because of vulnerability.  Burge draws this argument from the third requirement for finding particular vulnerability: that the vulnerability must have been a substantial factor in the commission of the crime.  *State v. Suleiman*, 158 Wn.2d 280, 292 (2006).  Case law does not support Burge's understanding of this requirement.

24

In *State v. Gordon*, 172 Wn.2d 671, 260 P.3d 884 (2011), the Washington Supreme Court upheld the trial court's finding that the murder victim, Brian Lewis, was particularly vulnerable when he was beaten to death by five men. Lewis intervened in a fight between John Gordon and a woman. Subsequently, a verbal confrontation ensued and Gordon punched Lewis in the head. Gordon and a friend then punched and kicked Lewis, while he lay on the ground. By the end of his beating, Gordon and his friends outnumbered Lewis five-to-one. Witnesses testified that, due to the number of attackers, Lewis could not have defended himself. Our high court held that the jury reasonably could have found Lewis particularly vulnerable as a solitary victim and that his vulnerability was a substantial factor in the commission of the crime, because his assailants were aware of the vulnerability by virtue of the fact that they placed him in that situation. Lewis' particular vulnerability of being outnumbered did not arise until after the assault on him began. The vulnerability was not the only reason for the assault.

Ryan Burge next maintains that the State must provide comparative evidence of typical crimes to prove the atypicality of the current offense for the purpose of proving an aggravating circumstance. This court, in *State v. Burrus*, 17 Wn. App. 2d 162, 484 P.3d 521 (2021), *review denied*, *1*98 Wn.2d 1006, 496 P.3d 746 (2021) rejected this contention. When entering his finding of an aggravating factor, jurors bring their opinions, insights, common sense, and everyday life experience into deliberations. The

25

State need not later justify the entry of the factor by comparisons to other similar or dissimilar situations.

## Position of Trust

We move to the second aggravating factor: position of trust. A court may sentence a defendant beyond the standard range, under RCW 9.94A.535(3)(n), on evidence beyond a reasonable doubt that "[t]he defendant used his or her position of trust, confidence, or fiduciary responsibility to facilitate the commission of the current offense." RCW 9.94A.535(3)(n) only applies to purposeful conduct. *State v. Hylton*, 154 Wn. App. 945, 953, 226 P.3d 246 (2010). When considering this aggravating circumstance, the fact-finder engages in a two-part inquiry: (1) whether the defendant was in a position of trust and (2) whether he or she used that position of trust to facilitate the crime. *State v. Bedker*, 74 Wn. App. 87, 95, 871 P.2d 673 (1994).

Whether a defendant is in a position of trust depends on "the duration and the degree of the relationship" with the victim. *State v. Grewe*, 117 Wn.2d 211, 218, 813 P.2d 1238 (1991). A relationship extending over a longer period of time, or one within the same household, would indicate a more significant trust relationship. *State v. Fisher*, 108 Wn.2d 419, 427 (1987). Other factors to consider when determining a position of trust include the vulnerability of the victim to trust because of age and the degree of the defendant's culpability. *State v. Bedker*, 74 Wn. App. 87, 95 (1994).

The State's evidence showed that Ryan Burge was in a position of trust with Heather. He resided with Nataasha Tafoya and her children for a few nights per week, beginning in September 2018, approximately two months before Heather's death. Tafoya trusted and relied on Burge to care for Heather while she worked. Heather was vulnerable to trust Burge due to her young age.

Ryan Burge argues that the State must prove more than he was in a position of trust. He contends that the State needed to show he used his position of trust to facilitate the crime. Burge concedes that he babysat Heather at the time she sustained injury and that Nataasha Tafoya tasked and trusted him with this caretaking position. He contends, however, that he did not use his status as caretaker to gain access to Heather.

Ryan Burge's reading of the aggravating factor finds support in caselaw. This court once reasoned, when analyzing whether Harold Brown had abused his position of trust with his 11-year-old son Jesse Brown:

> to be an aggravating factor, an abuse of the trust relationship must be used to *facilitate* the commission of the crime. Even if we were to determine that Brown abused his position of trust, there is no evidence that Brown used his position as Jesse's father to facilitate the commission of a crime. Brown did not use his position as a way to be alone with the child to commit the assault. Nor did he in some way convince Jesse that because he was the child's father he would not hurt him if Jesse submitted to the punishment.

*State v. Brown*, 60 Wn. App. 60, 76, 802 P.2d 803 (1990). While the Supreme Court disapproved *Brown*, it did so on alternative grounds, and in fact endorsed this court's

reasoning in the above cited paragraph. The Supreme Court "share[d] the Court of Appeals' belief not every crime committed by a parent against a child involves an abuse of a position of trust." *State v. Grewe*, 117 Wn.2d 211, 220 (1991). Similarly, the Supreme Court noted that "the literal language of [the aggravator] is suited to cases involving a purposeful abuse of trust inasmuch as the statute requires the defendant to have used a position of trust to facilitate the commission of the crime." *State v. Chadderton*, 119 Wn.2d 390, 398, 832 P.2d 481 (1992).

We agree with Ryan Burge that the State did not demonstrate Burge intentionally utilized his position of trust to facilitate Heather's murder. Although Burge certainly found himself in a position of trust with Heather and Burge committed the murder while Heather was under his care, no evidence suggested Burge intentionally entered into the position of trust with a preplanned design to commit a crime against young Heather.

While the evidence did not support the imposition of the position of trust aggravating factor, our holding does not necessitate remand for resentencing. When a sentencing court expressly states that the same exceptional sentence would be imposed based on any one aggravating factor standing alone, this court may uphold an exceptional sentence even after overturning one of the aggravating factors. *State v. Weller*, 185 Wn. App. 913, 930, 344 P.3d 695 (2015). The trial court specified that any of the imposed aggravating factors, standing alone, would justify the exceptional sentence. Because we affirm the trial court's imposition of aggravating factors for Heather's particular

vulnerability and the manifestation of deliberate cruelty toward Heather, we decline to remand for resentencing.

Ryan Burge also asserts that the aggravating factor does not apply because any misconduct by him toward Heather was unintentional. We reject this additional contention based on our earlier ruling that sufficient evidence supported a finding of intentionality, although the State only needed to prove recklessness.

### Deliberate Cruelty

The final aggravating factor assessed against Ryan Burge is deliberate cruelty. A defendant may receive an exceptional sentence pursuant to RCW 9.94A.535(3)(a), if the finder of fact determines, beyond a reasonable doubt, that the defendant's "conduct during the commission of the current offense manifested deliberate cruelty to the victim." Deliberate cruelty consists of gratuitous violence or other conduct that inflicts physical, psychological, or emotional pain as an end in itself. *State v. Tili*, 148 Wn.2d 350, 369, 60 P.3d 1192 (2003). To justify an exceptional sentence, the cruelty must go beyond that normally associated with the commission of the charged offense or inherent in the elements of the offense. *State v. Tili*, 148 Wn.2d 350, 369 (2003). The threshold for deliberate cruelty is high. *State v. Barnett*, 104 Wn. App. 191, 205 (2001).

Ryan Burge maintains that the State did not prove beyond a reasonable doubt that the alleged crime he committed manifested deliberate cruelty atypical of second-degree murder. He argues the State needed to present evidence comparing the facts of this case

with other homicides significantly less egregious for the deliberate cruelty aggravator to apply. He further asserts that the evidence did not establish he committed pain as an end in itself. He claims that testimony established that Heather had lost consciousness due to her injuries shortly after the first blow.

As already written, the State did not need to present comparative evidence in order to prove an aggravating factor beyond a reasonable doubt. *State v. Burrus*, 17 Wn. App. 2d 162, 172 (2021).

Ryan Burge cites no authority holding that an assault leading to unconsciousness or a quick death cannot constitute deliberately cruelty. Regardless, Heather's death was not quick. While Dr. Martha Burt testified that the subarachnoid hemorrhage Heather suffered was fatal and would have had an immediate effect, she also testified that her death would have taken several hours. Along with many injuries to her face and head, Heather also sustained injuries to her torso, legs, and arms which, alone, might not have been fatal. Dr. Burt estimated that Heather was hit a minimum of approximately fifty times during her assault.

In *State v. Gordon*, 172 Wn.2d 671 (2011), previously discussed, the Washington Supreme Court upheld the trial court's finding that defendants' misconduct during the murder of Brian Lewis manifested deliberate cruelty. The Washington Supreme Court reasoned, with minimal analysis:

30

> Lewis was already on the ground when the defendants put him a [sic] choke hold and continued hitting him. They stomped on his head and kicked him repeatedly, although their punches had already felled him. In light of this particularly savage beating, we cannot say the jury rested its verdict on insufficient evidence when it found the defendants acted with deliberate cruelty.

*State v. Gordon*, 172 Wn.2d at 681.

During Ryan Burge's trial, the State presented evidence supporting a finding of a savage and repeated beating of Heather. She suffered a traumatic brain injury after numerous strikes to her body, face, and head. She entered a coma.

Improper Judicial Fact-finding

Ryan Burge contends that the trial court imposed an exceptional aggravated sentence based on improper judicial fact-finding relating to the aggravating factors. The State responds that the court did not engage in additional fact-finding during its oral ruling, but instead correctly determined that the aggravating circumstances found by the jury justified an exceptional sentence.

Facts supporting an aggravating circumstance justifying an exceptional sentence must be proven beyond a reasonable doubt. RCW 9.94A.537(3). RCW 9.94A.537(6) declares, in its entirety:

> If the jury finds, unanimously and beyond a reasonable doubt, one or more of the facts alleged by the state in support of an aggravated sentence, the court may sentence the offender pursuant to RCW 9.94A.535 to a term of confinement up to the maximum allowed under RCW 9A.20.021 for the underlying conviction if it finds, considering the purposes of this chapter,

that the facts found are substantial and compelling reasons justifying an
exceptional sentence.

The jury's finding, alone, provides a trial court with a substantial and compelling reason

to impose an aggravated exceptional sentence. *State v. Perry*, 6 Wn. App. 2d 544, 549,

431 P.3d 543 (2018).

The trial court entered findings of fact and conclusions of law for an exceptional

sentence. The findings mentioned that the jury found, by special verdict, three

aggravating factors and that, taken together or individually, the factors justified an

exceptional sentence. The two conclusions of law stated that substantial and compelling

reasons justified an exceptional sentence.

Ryan Burge contends that the trial court engaged in improper fact-finding when,

during its oral ruling at sentencing, the court commented on Heather's particular

vulnerability due to her age and reliance on adults, Heather's presence at home

contributing to her vulnerability, and Burge's position of trust as Heather's temporary

caretaker. Burge highlights the trial court's remarks:

> Children throw temper tantrums. We all know that as caretakers of
> children that those type [sic] of things can happen with a child, and it's how
> you respond to it. And the way that Mr. Burge responded was over the top
> and ended up resulting in the death of [Heather].

RP at 1952.

Ryan Burge argues that these trial court comments demonstrate that the court

relied on its own findings to support an exceptional sentence and that these findings do

32

not correlate to the jury findings. Burge highlights that the jury was not tasked to and

never did determine that his response to Heather's temper tantrum "was over the top."

RP at 1952. Burge asserts that, by formulating its own findings, the sentencing court

violated *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004)

and his right to a jury trial and due process of law.

Ryan Burge cites *State v. Perry*, 6 Wn. App. 2d 544 (2018), in which this court

held that a trial court, when imposing an exceptional sentence, may not make additional

findings of fact beyond the jury's special verdict finding of an aggravating circumstance.

In *Perry*, this court remanded for resentencing, because the trial court entered additional,

written findings of fact justifying an exceptional sentence.

We distinguish *State v. Perry*. Ryan Burge's trial court only entered findings of

fact establishing that the jury found, by special verdict, that the aggravating

circumstances alleged constituted substantial and compelling reasons warranting an

exceptional sentence. The court did not enter additional findings of fact justifying the

aggravated circumstances or the exceptional sentence. The court's comments coincided

with the jury findings.

*State v. Sage*, 1 Wn. App. 2d 685, 708, 407 P.3d 359 (2017) parallels Ryan

Burge's sentencing. In *Sage*, this court observed that, once the jury by special verdict

makes the factual determination whether aggravating circumstances have been proved

beyond a reasonable doubt, the sentencing court only enters the legal conclusion of

33

whether the facts found were sufficiently substantial and compelling to warrant an

exceptional sentence. The trial court entered findings of fact that the jury entered special

verdicts finding aggravating factors. The court also concluded that the jury's findings

presented substantial and compelling grounds for an exceptional sentence. This court did

not fault the sentencing court for reciting the evidence that supported the jury findings

during the sentencing hearing. Reciting the evidence did not constitute prohibited factual

finding. Ryan Burge cites to no case law prohibiting the trial court from discussing the

evidence supporting the jury's special verdict finding, during the court's oral ruling.

## Void for Vagueness

Ryan Burge argues that all of the aggravators, under RCW 9.94A.535(3) and

found by the jury, are unconstitutionally vague. Thus, he requests resentencing within

the standard range. The State responds that aggravating circumstances found by a jury

are not subject to a vagueness review.

The due process clauses of the Fifth and Fourteenth Amendments to the United

States Constitution require that statutes afford citizens a fair warning of prohibited

conduct. *State v. Murray*, 190 Wn.2d 727, 736, 416 P.3d 1225 (2018). A statute is

unconstitutionally vague if: (1) it fails to define the offense with sufficient precision that

a person of ordinary intelligence can understand it, or (2) it does not provide standards

sufficiently specific to prevent arbitrary enforcement. *State v. Duncalf*, 177 Wn.2d 289,

296-97, 300 P.3d 352 (2013); *State v. Eckblad*, 152 Wn.2d 515, 518, 98 P.3d 1184 (2004).

In *State v. Baldwin*, 150 Wn.2d 448, 78 P.3d 1005 (2003), the Washington Supreme Court held that due process considerations that underlie the void-for-vagueness doctrine do not apply in the context of sentencing guidelines. The court reasoned that sentencing guideline statutes do not define conduct nor do they allow for arbitrary arrest and criminal prosecution.

RCW 9.94A.535(3) simply identifies the factors that may allow a trial court to impose an exceptional sentence above the standard range, not to exceed the statutory maximum, without identifying a particular sentence or sentence range. *State v. Brush*, 5 Wn. App. 2d 40, 61, 425 P.3d 545 (2018). The statute does not mandate that the trial court impose an exceptional sentence. Rather, the rule permits the imposition of an exceptional sentence based on aggravating circumstances. RCW 9.94A.535(3). The Court of Appeals, in *State v. Brush*, reaffirmed that *State v. Baldwin* remains good and binding law.

In *Beckles v. United States*, ___U.S.___, 137 S. Ct. 886, 888, 197 L. Ed. 2d 145 (2017), the United States Supreme Court interpreted the federal sentencing guidelines as constituting advisory guidelines that do not fix the permissible range of sentences. The guidelines instead guide the exercise of a court's discretion in choosing an appropriate sentence within the statutory range. Therefore, the Court did not subject the federal

guidelines to a vagueness challenge. Ryan Burge contends the Washington sentencing statute impose rigid rules, not guidelines, such that this court should review the statutes for vagueness.

In *State v. Burrus*, 17 Wn. App. 2d 162, 484 P.3d 521 (2021), this court rejected Ryan Burrus' vagueness challenge because a jury finding does not compel an exceptional sentence. The presence of an aggravating factor permits, but does not require, the sentencing court to impose an exceptional sentence.

Offender Score

Ryan Burge maintains that the trial court miscalculated his offender score at 3 points by improperly including, as two points, a prior federal conviction for conspiracy to commit arson pursuant to 18 U.S.C. 844(i) and (n). Burge argues that his federal conviction was neither legally nor factually comparable to any Washington offense. He asserts that the facts contained in his plea agreement for the federal conviction, on which the trial court relied when finding factual comparability, were not sufficiently tethered to the elements of the federal crime.

The State responds that Ryan Burge's federal conviction was factually comparable to Washington's crime of arson in the first degree under RCW 9A.48.020(b) because the factual admissions of Burge's guilty plea included sufficient facts to establish a crime in Washington. It argues that the trial court correctly concluded that these agreed facts compared to facts needed to convict in a Washington State prosecution.

36

This court reviews a trial court's calculation of a defendant's offender score de novo. *State v. Olsen*, 180 Wn.2d 468, 472, 325 P.3d 187 (2014). Out-of-state convictions for offenses shall be classified according to the comparable offense definitions and sentences provided by Washington law. RCW 9.94A.525(3). The foreign offense must be compared to a Washington statute in effect when the individual committed the foreign crime. *State v. Morley*, 134 Wn.2d 588, 606, 952 P.2d 167 (1998).

Washington law employs a two-part test to determine the comparability of a foreign offense. *State v. Thiefault*, 160 Wn.2d 409, 415, 158 P.3d 580 (2007). First, courts analyze legal comparability by determining whether the elements of the foreign offense are substantially similar to the elements of the Washington offense. *State v. Thiefault*, 160 Wn.2d 409, 415 (2007). Second, if the foreign offense's elements are broader than the Washington offense's elements, courts analyze factual comparability by determining whether the conduct underlying the foreign offense would have violated the comparable Washington statute. *State v. Thiefault*, 160 Wn.2d at 415. When determining factual comparability, the sentencing court may rely on facts in the foreign case record that were admitted, stipulated to, or proved beyond a reasonable doubt. *State v. Thiefault*, 160 Wn.2d at 415. Facts in a charging document that are untethered to the elements of a crime are outside the proper scope of what courts may consider in the factual prong of analysis. *State v. Davis*, 3 Wn. App. 2d 763, 782, 418 P.3d 199 (2018).

The State bears the burden of proving the existence and comparability of a defendant's out-of-state conviction by a preponderance of the evidence. *State v. Collins*, 144 Wn. App. 547, 554, 182 P.3d 1016 (2008). When a foreign statute reads broader than Washington's statute, factual comparability analysis may not be possible because there may have been no incentive for the accused to have attempted to prove that he did not commit the narrower offense. *In re Personal Restraint of Lavery*, 154 Wn.2d 249, 257, 111 P.3d 837 (2005).

The State concedes that the elements of federal arson under 18 U.S.C. 844(i) are not legally comparable to any Washington offense, including Washington arson under RCW 9A.48.020(1)(b). We outline the elements enumerated in each statute, however, as they will be relevant for the factual comparability analysis.

18 U.S.C. 844(i) governs federal arson, and states in pertinent part:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both.

A person who conspires to commit arson is guilty under 18 U.S.C. 844(n).

RCW 9A.48.020 governs arson in the first degree in Washington State, and states in relevant part:

> (1) A person is guilty of arson in the first degree if he or she knowingly and maliciously:
> . . . .

(b) Causes a fire or explosion which damages a dwelling.

The elements of 18 U.S.C. 844(i) are broader than those in RCW 9A.48.020(1)(b) because the federal statute does not require that the defendant knowingly set a fire and does not limit what type of building be damaged by a set fire.

Ryan Burge argues that the trial court could only consider the facts of his plea agreement insofar as they related to the elements of the charged offense, federal arson. Thus, according to Burge, the court erroneously considered the facts in his plea agreement.

The State contends that, in his plea agreement, Ryan Burge admitted to conspiring to setting fire to and damaging a duplex, a residential building. The State urges that it would be impossible for a court to perform a factual comparability analysis if it were prohibited from considering facts that established the elements of a foreign crime.

Ryan Burge does not deny that the building he set aflame was a dwelling. Instead, he insists that the fact he torched a dwelling is a non-elemental fact, one that was superfluous to a finding of his guilt under 18 U.S.C. 844(i) and (n). He notes that whether the damaged property was a dwelling was irrelevant to the federal charge.

Ryan Burge cites *State v. Morley*, 134 Wn.2d 588, 606 (1998), in which this court stated:

> While it may be necessary to look into the record of a foreign conviction to determine its comparability to a Washington offense, the elements of the charged crime must remain the cornerstone of the

comparison. Facts or allegations contained in the record, if not directly related to the elements of the charged crime, may not have been sufficiently proven in the trial.

Ryan Burge also cites *State v. Davis*, 3 Wn. App. 2d 763 (2018), in which this court held that facts in a charging document that are untethered to the elements of a crime are outside the proper scope of what courts may consider in the factual prong of analysis. Allowing the use of such facts is also inappropriate because a defendant charged with a broader foreign offense may not have an incentive to prove that he is guilty of narrower conduct covered by a Washington statute.

Ryan Burge essentially interprets the case law as prohibiting trial courts from considering, during a factual comparability analysis, any facts that could satisfy the elements of a narrower offense, if the broader foreign offense did not contain the same elements. If accepted, this interpretation would effectively eliminate factual comparability and only allow for a foreign offense to be counted toward an offender score if it is legally comparable. We reject Burge's reading of the law.

The State cites *State v. Howard*, 15 Wn. App. 2d 725, 476 P.3d 1087 (2020), *review denied*, 197 Wn.2d 1006, 483 P.3d 783 (2021), in which this court reaffirmed that the factual comparability analysis is appropriate if it is limited to the consideration of only those facts charged and proved beyond a reasonable doubt to a jury or admitted by the defendant. In *Howard*, this court clarified *State v. Davis*:

There, Division One considered whether five prior California burglary convictions were factually comparable to the Washington crime of burglary. The State alleged that the defendant unlawfully entered a building in each of those prior incidents, and the defendant pleaded guilty to each charge. However, the *Davis* court focused *only on the language in the charging document, not a plea statement where the defendant admitted to underlying facts*.

. . . .

Unlike in Davis*, here we have a specific plea statement where Howard admitted to the underlying facts proving the elements of the foreign crime*.

*State v. Howard*, 15 Wn. App. 2d at 734-35 (internal citations omitted) (emphasis added).

As in *State v. Howard*, Ryan Burge's sentencing court reviewed facts contained in a plea agreement Burge entered. 18 U.S.C. 844(i) did not require that Burge knowingly set fire to a dwelling. Nevertheless, this lack of a requirement does not mean that the pleaded facts do not relate to the elements of Burge's charge. In his plea agreement, Burge admitted to conspiring to and maliciously setting fire to a building. This fact satisfied the "maliciously damages or destroys" element. 18 U.S.C. 844(i). Additionally, the fact that Burge set aflame to a dwelling satisfied the element that he damaged, by fire, "any building, vehicle, or other real or personal property." 18 U.S.C. 844(i).

Contrary to Ryan Burge's contention, the sentencing court considered only those facts of Burge's plea agreement that were sufficiently tethered to federal conspiracy to commit arson. Therefore, the court correctly assessed two points to Ryan Burge's offender score because of his 2009 conviction for federal conspiracy to commit arson.

41

Community Custody Conditions

Ryan Burge asserts that the trial court improperly ordered him to pay community custody supervision fees, even though it found him to be indigent. The State agrees that this court should remand for the trial court to strike the supervision fee provision from the judgment and sentence. We accept the State's concession.

During the sentencing hearing, the trial court found Ryan Burge indigent and unable to pay fines and obligations. The judgment and sentence, however, contains a community custody provision requiring Burge to pay supervision fees as determined by the Department of Corrections.

RCW 9.94A.703(2)(d) provides that, "[u]nless waived by the court, as part of any term of community custody, the court shall order an offender to pay supervision fees as determined by the department." Imposition of a discretionary fee that a trial court had orally waived should be stricken from the final judgment and sentence. *State v. Bowman*, 198 Wn.2d 609, 629,498 P.3d 478 (2021). Supervision fees are discretionary legal financial obligations due to their waivable nature. *State v. Dillon*, 12 Wn. App. 2d 133, 152, 456 P.3d 1199, *review denied*, 195 Wn.2d 1022, 464 P.3d 198 (2020).

CONCLUSION

We affirm Ryan Burge's conviction and the trial court's decision to impose an exceptional sentence. We remand, however, for the trial court to strike from the

42

judgment and sentence the provision requiring Burge to pay community custody supervision fees.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

I CONCUR:

_____
Siddoway, C.J.

_____
Staab, J.